## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| PETER NYGARD, NYGARD INTERNATIONAL PARTNERSHIP, and NYGARD INC.<br><br>                        Plaintiffs,<br><br>v.<br><br>JACKY JASPER a/k/a SEAN MERRICK a/k/a GREG COMEAU a/k/a HOLLYWOOD STREET KING a/k/a HSK d/b/a DIARYOFAHOLLYWOODSTREETKING.COM; and JOHN or JANE DOES 1-10,<br><br>                        Defendants. | **Case No.**<br><br><br>**COMPLAINT** |

Plaintiffs, PETER NYGARD (hereinafter "Nygard"), NYGARD INTERNATIONAL PARTNERSHIP, and NYGARD INC. (hereinafter the "Nygard Entities") (together "Nygard" and the "Nygard Entities" shall be referred to as "Plaintiffs" unless otherwise specifically designated) by their attorneys, WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, complaining of Defendants JACKY JASPER a/k/a SEAN MERRICK a/k/a GREG COMEAU a/k/a HOLLYWOOD STREET KING a/k/a HSK d/b/a DIARYOFAHOLLYWOODSTREETKING.COM (hereinafter "Jasper") and yet to be identified individuals sued as JOHN or JANE DOES 1-10 (the "Doe Defendants") ("Jasper" and "Doe Defendants" collectively "Defendants" unless otherwise specifically designated), allege as follows:

### PARTIES:

1.     Plaintiff Nygard, an individual, is and at all times relevant was, a citizen of Canada residing in the Bahamas.

2.     Plaintiff Nygard International Partnership is a partnership registered in the Province of Manitoba and, amongst other things, carries on business as a designer, manufacturer, seller and distributor of women's clothing throughout Canada and the world, with its principal administrative offices located at 1771 Inkster Boulevard, in the City of Winnipeg, in the Province of Manitoba.

3.     Plaintiff Nygard Inc. is a Delaware Corporation headquartered in New York, New York.

4.     Upon information and belief, Defendant Jasper is an individual with several aliases who is residing in this judicial district.

5.     Defendants, singularly and in concert, create, author, develop, host and disseminate information, including "original content" and other material, on the Internet, including without limitation, in connection with the "Hollywood Street King" interactive website owned, operated and/or otherwise controlled by the Defendants and accessible in this judicial district via the following URLs among others:   www.DiaryofaHollywoodStreetKing.com and www.HollywoodStreetKing.com (together the "Website" as both direct to the same page).

6.     Defendants also create, author, develop and disseminate information, content, and other material through various distribution channels, including without limitation, mobile applications and other Internet-based platforms such as Hollywood Street King "affiliate" sites, Twitter via the username "@JackyJasper", Facebook via the user accounts "Diary of a Hollywood Street King" and "Jacky Jasper" and You Tube via the user name "hollywoodstreetkings" (the "Affiliate Sites").

7.     Plaintiffs are currently without the ability to ascertain the true identities of the Doe Defendants but are informed and believe that such persons are and at all material times have directly and/or indirectly engaging or assisting in the conduct alleged herein, or are acting in concert with Defendant Jasper and are liable for the violations alleged in this Complaint.

## JURISDICTION AND VENUE:

8.     This is a civil action arising under the Lanham Act and the laws of the State of Florida as a result of Defendants' malicious creation, publication, hosting and dissemination of material over the Internet containing false and defamatory statements regarding Plaintiff Nygard and the Nygard Entities and using unauthorized reproductions of Nygard's name and photograph, illegally obtained recordings of Nygard, and unauthorized reproductions of federally registered trademarks owned by the Nygard Entities.

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332(a) and supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

10.     This Court has personal jurisdiction over Defendants because Defendants, upon information and belief, resides in this judicial district.  Additionally, Defendants are currently operating, conducting, engaging in, or carrying on a business in Florida and supplying services within the State of Florida and committing tortious acts within this State by, among other things, continuing to post defamatory and otherwise unlawful material accessible within the State of Florida and accessed by individuals within the State of Florida.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because, upon information and belief, Defendants reside in this judicial district, and because a substantial part of the events at issue and Defendants' unlawful acts have occurred in this district.

**GENERAL ALLEGATIONS:**

12.     The Nygard Entities are in the business of manufacturing, advertising, and distributing high-quality merchandise throughout the world, including the United States.

13.     Plaintiff Nygard is principal, beneficial owner, and a prominent figure with respect to both Nygard Entities.

14.     For years, and well before the acts of the Defendants identified herein, the Nygard Entities have continuously used various trademarks to identify and distinguish their goods in the marketplace.  These distinctive trademarks include various common law trademarks as well as the following marks, which are among the many distinctive trademarks owned by the Nygard Entities or affiliates, and registered on the Principal Register of the United States Patent and Trademark Office:  Registration No. 3,979,204; Registration No. 3,690,655; Registration No. 3,570,073, Registration No. 3,730,399, Registration No. 3,424,971; and Registration No. 3,512,888, Registration No. 3,276,120 (the federally registered trademarks hereinafter collectively referred to as the "Nygard Trademarks").  True and correct copies of the registration certificates associated with the Nygard Trademarks are attached hereto as Exhibit 1.  These trademarks are also registered in Canada and other jurisdictions.

15.     The Nygard Trademarks have at all relevant times been owned by the Nygard Entities or their affiliates or predecessors.

16.     In continuous and exclusive use for years, as well as being the subject of the expenditure of millions of dollars in promotion and advertising, the Nygard Trademarks and the related Nygard "brand" are recognized as indicators of source for the Nygard Entities' high-

quality goods and are the embodiments of the substantial and valuable goodwill associated with Nygard products.

17.     As a result of the substantial investment in the promotion of the Nygard Trademarks, and the goods associated therewith, the consuming public has come to immediately recognize and associate the marks/brand with high-quality products manufactured, sponsored, distributed, sold, or approved by Plaintiffs.

18.     As a result of Plaintiffs' significant investment and promotional efforts, and prior to the acts of Defendants alleged herein, the Nygard Trademarks have become famous in the minds of consumers as designations of source for Nygard goods.

19.     The Nygard Trademarks are symbols of the Nygard Entities' quality, reputation and goodwill and have never been abandoned.

20.     The Nygard Entities' brands, commercial reputations, and credit among the general public and business community are reliant upon, and inextricably intertwined with, Nygard's personal reputation and credit.

21.     The specifics of the close public association between the activities of Nygard and the Nygard Entities, well known to Defendants and the public, generally, are as follows:

(a)     Nygard is the principal of Nygard International Partnership; and,

(b)     Nygard International Partnership markets its products using Nygard's name and his personal and photographic image.

22.     Consequently, the following untrue and defamatory statements and innuendo referred to herein tend to lower the Nygard Entities in the estimation of right thinking members of society generally, and reflect negatively on and impugn the character and reputation of the

Nygard Entities in addition to the character and reputation of Plaintiff Nygard individually.  The untrue and defamatory statements and innuendo mentioned herein tend to bring Nygard and the Nygard Entities into odium and contempt, disparage and reflect negatively on them, and generally, constitute defamatory words of and concerning the Nygard and the Nygard Entities.

23. Indeed, the Nygard Entities market their products using Nygard's name and his personal photographic image, including without limitation, in connection with the numerous trademarks containing Nygard's surname referenced above.

24. For several years, Defendants have engaged in a systematic attack on the reputations of Nygard and the Nygard Entities.  Such conduct includes malicious creation, publication and dissemination of material on the Internet, including content appearing on the Website as early as February 6, 2012 directed at false allegations regarding Mr. Nygard's private personal life.  The subject postings were republished by Defendants when the Website was redesigned and moved earlier this year.

25. Defendants represent the Website as "the realest celebrity gossip and philosophy blog on the internet."  *See*, Advertise on HSK, Diary of a Hollywood Street King, available at: http://diaryofahollywoodstreetking.com/advertise-on-hsk/ (last visited August 18, 2015).

26. The Website is interactive and accessible worldwide, including within the State of Florida, and therefore publishes and circulates its content within Florida.

27. Upon information and belief, Defendants, as the intended purpose of the Website, obtain revenue, including without limitation in the form of third party advertising, as a result of its maintenance and operation of the Website and the dissemination of content thereon.

28.     According to the Website, the services Defendants offer in connection with the Website include the creation, publication and dissemination of "original content," including gossip, rumors, and conjecture together with "accurately reported information in a satirical fashion."  *See*, Terms of Use at §§ 1 and 11, Diary of a Hollywood Street King, available at: http://diaryofahollywoodstreetking.com/hsk-terms-of-use/ (last visited August 18, 2015).

29.     The Website holds itself out as a provider of "news" (among other things), and states that "HSK content is delivered to MILLIONS" of readers and consumers "on a monthly basis direct [*sic*] from the website and through the various syndication outlets."  *See*, Advertise on HSK, Diary of a Hollywood Street King, available at: http://diaryofahollywoodstreetking.com/advertise-on-hsk/ (last visited August 18, 2015).

30.     Upon information and belief, sometime prior to February 25, 2014, Defendants created, authored and otherwise developed multiple postings comprised of written content (titles, narratives, statements, representations, implications, and innuendo), images, video footage, electronic message boards, commentary and other material (collectively a "Posting") concerning Plaintiff Nygard his private life, and the Nygard Entities.

31.     One of these Postings, entitled "Peter Nygard Pays for His Sexual Deviance…" and attributing authorship to Defendant Jasper, contains numerous express, or by necessary implication, defamatory statements and misrepresentations, including without limitation false statements that Nygard indulges in immoral, repugnant and unlawful sexual activities (the "2.11.14 Posting").  The 2.11.14 Posting expressly identifies Plaintiff Nygard in his professional capacity, characterizing him as "the Nygard International CEO" and falsely states and/or suggests through explicit assertions and/or implication or innuendo that Plaintiff Nygard is a

dishonest and immoral person who engages in sexually repugnant, unlawful, and nefarious activities and with whom people should not conduct business. Upon information and belief, this Posting was initially published sometime in 2012, only to be republished multiple times thereafter on the Website and other Internet platforms, as indicated by, among other things, the removal of the attribution of authorship to Defendant Jasper and the inclusion of a new image featuring Plaintiff Nygard.

32.     On February 24, 2014, Defendant Jasper, through counsel, sent an email containing three attachments to counsel for Plaintiff Nygard purporting to seek a response from Plaintiffs regarding the contents of the attachments which were described as "exposes."   These attachments were virtually identical to the Postings identified below.  Plaintiff's attorney informed Jasper that the attachments contained defamatory, malicious and damaging material, and were the fruit of an extortion effort by other persons against Plaintiff Nygard.  Plaintiff's attorney put Jasper on notice that the postings should not be published and that the attachments contained defamatory, malicious and damaging material.  Jasper callously disregarded this information and warning.

33.     Upon information and belief, Jasper's intent in communicating with Plaintiff's attorney in this manner was for the purpose of harassing and/or threatening Plaintiff Nygard.

34.     On or about February 25, 2014, Defendants published a work prominently featuring Plaintiff Nygard's name and image and an unauthorized reproduction of the Nygard Trademark entitled: "Fashion Tycoon Peter Nygard Paid $10K To Make Scat Video To [sic] Go Away!" containing numerous express, or by necessary implication, defamatory statements and misrepresentations, including without limitation references to Plaintiff Nygard's immoral,

repugnant and unlawful sexual activities (the "2.25.14 Posting").  The 2.25.14 Posting expressly identifies Plaintiff Nygard in his professional capacity, characterizing him as a "fashion tycoon" and emblazoning an image of his face with the Nygard trademark and falsely states and/or suggests through explicit assertions and/or implication or innuendo that Plaintiff Nygard is a dishonest and immoral person who engages in sexually repugnant, criminal, unlawful, and nefarious activities and with whom people should not conduct business.

35.     Defendants' unauthorized use, display, and reproduction of the Nygard Trademarks on its Website devoted to the provision of salacious and low-brow content, including in connection with the Posting, is causing harm to Plaintiffs insofar as the consuming public will associate the Nygard Trademarks with the unsavory services offered by Defendants, thereby diminishing the goodwill and prestige symbolized by the Nygard Trademarks and the Nygard Brand.

36.     On or about February 27, 2014, Defendants published and disseminated another work on the Internet, including on the Website, entitled: "Peter Nygard's Sadist Wrath Caught On Camera!" containing numerous express, or by necessary implication, defamatory statements and misrepresentations, including without limitation statements referencing "Nygard's workplace bullying and harassment." (the "2.27.14 Posting").  The 2.27.14 Posting expressly identifies Plaintiff Nygard in his professional capacity, referencing the "workplace" Nygard "employees" and characterizing him as a "clothing tycoon" and falsely states and/or suggests through explicit assertions and/or implication or innuendo that Plaintiff Nygard is a dishonest and immoral person who engages or is complicit in sexually repugnant, unlawful, and nefarious activities and with whom people should not conduct business.

37.     The 2.27.14 Posting also features two videos of Plaintiff Nygard "secretly filmed" in his home that were uploaded to the Defendants' You Tube account, "hollywoodstreetkings" (collectively, the "Videos").  These Videos were illegally obtained as Nygard did not consent to the recording of his voice or image and the footage was obtained on his property without his permission. The 2.27.14 Posting characterizes the featured footage as "one of the many [videos of Mr. Nygard] [Defendant has] obtained" and includes the following statement:  "Be sure to check back with us as there is much more about Nygard to come…"

38.     On or about February 28, 2014, Defendants published and disseminated another work on the Internet, including on the Website, entitled: "Peter J. Nygard Exposed Doctoring Death to Cheat Death!"  containing numerous express, or by necessary implication, defamatory statements and misrepresentations, including without limitation statements that "Nygard's fortune has proven to pay off Bahamian political figures…" and references to "proven dark secrets and shocking truths" underlying Plaintiff Nygard's purported "human cloning" "mission" "banned in more than 30 countries" consisting of women "giv[ing] up their unborn babies" and "undergoing in vitro fertilization without the presence of licensed doctors" resulting in "the destruction of healthy embryos" and "the cost of lives" (the "2.28.14 Posting").  The 2.28.14 Posting expressly identifies Plaintiff Nygard in his professional capacity as the "face of Canadian women's wear" a "retail clothing giant" and "a wealthy force in fashion apparel" and utilizing the Nygard Trademarks.  Reasonably interpreted, the 2.28.14 Posting falsely states and/or suggests through explicit assertions and/or implication or innuendo that Plaintiff Nygard is a dishonest and immoral person who engages or is complicit in criminal, unlawful and nefarious activities and with whom people should not conduct business. The 2.28.14 Posting also contains

an unauthorized reproduction of an audio visual work that contains material that was created and owned by Plaintiffs.

39.     On or about March 3, 2014, Defendants published and disseminated yet another work on the Internet, including on the Website, entitled: "Suspected Peter Nygard Notes Point To 2010 Death as MURDER!" containing numerous express, or by necessary implication, defamatory statements and misrepresentations, including without limitation "dial Nygard for Murder?" emblazoned over an image of Plaintiff Nygard  (the "3.3.14 Posting").  The 3.3.14 Posting expressly identifies Plaintiff Nygard in his professional capacity, referencing purported unlawful employment practices, an "ex-employee of Nygard's" and the stylized Nygard mark. Reasonably interpreted, the 3.3.14 Posting falsely states and/or suggests through explicit assertions and/or implication or innuendo that Plaintiff Nygard is a felon and a criminal involved in the commission of various crimes including murder, and otherwise engaged or complicit in unlawful and nefarious activities.

40.     On or about April 23, 2014, Defendants published and disseminated a work on the Internet, including on the Website, entitled: "Ex-Whore Wrangler Exposes Peter Nygard as a RACIST & SADIST!" containing numerous express, or by necessary implication, defamatory statements and misrepresentations, including without limitation Plaintiff Nygard's alleged association with a "whore wrangler" and the untrue factual assertions that Plaintiff Peter Nygard is a "racist" "sadist" and has engaged in "unthinkable proven criminal actions" and other specifically-enumerated sexually repugnant acts (the "4.23.14 Posting").  The 4.23.14 Posting expressly identifies Plaintiff Nygard in his professional capacity, characterizing him as a "clothing tycoon" and referencing an "ex-employee to Peter Nygard" and the stylized Nygard

mark. Reasonably interpreted, the 4.23.14 Posting falsely states and/or suggests through explicit assertions and/or implication or innuendo that Plaintiff Nygard is a criminal who engages or is complicit in sexually repugnant, unlawful, and nefarious activities and with whom people should not conduct business.

41.     On or about May 8, 2014, Defendant published and disseminated a work on the Internet, including on the Website, entitled: "Peter Nygard's Penis Pump Sexapades w/ Mr. Rikk Exposed!" containing numerous express, or by necessary implication, defamatory statements and misrepresentations (the "5.8.14 Posting").     The 5.8.14 Posting expressly identifies Plaintiff Nygard in his professional capacity, characterizing him as a "clothing line tycoon."  Reasonably interpreted, the 5.8.14 Posting falsely states and/or suggests through explicit assertions and/or implication or innuendo that Plaintiff Nygard is an immoral person who engages or is complicit in sexually repugnant, criminal, unlawful, and nefarious activities with a felon and with whom people should not conduct business.

42.     On or about July 11, 2014, Defendants published and disseminated a work on the Internet, including on the Website, entitled "James Bond (Sean Connery) vs. Peter "The Sadist" Nygard" containing an unauthorized reproduction of an image of Plaintiff Nygard and numerous express, or by necessary implication, defamatory statements and misrepresentations that, reasonably interpreted, falsely assert and/or suggest that Plaintiff Nygard is an immoral person who engages or is complicit in illegal conduct that is the basis of lawsuits initiated against the Bahamian government to which Plaintiff Nygard is not a party (the "7.11.14 Posting").

43.     On or about December 12, 2014, Defendants published and disseminated a work on the Internet, including on the Website, entitled "Beverly Johnson Follows Protocol:  Rolls on

Cosby, Covers For The Other Man" containing an unauthorized reproduction of an image of Plaintiff Nygard and numerous express, or by necessary implication, defamatory statements and misrepresentations (the "12.12.14 Posting").  The 12.12.14 Posting falsely states that Plaintiff engages in sexually repugnant and unlawful activities and, as a result of the structure of the posting and material pertaining to the sexual assault allegations asserted against comedian Bill Cosby under the image and statements regarding Mr. Nygard, suggests or implies that Plaintiff Nygard is an "abuser" engaged in conduct of a similar nature.

44.     The 2.11.14 Posting, the 2.25.14 Posting, the 2.27.14 Posting, the 2.28.14 Posting, the 3.3.14 Posting, the 4.23.14 Posting, the 5.8.14 Posting, the 7.11.14 Posting, and the 12.12.14 Posting together with any other posting Defendants published, disseminated, and/or caused to be published or disseminated on the Internet (inclusive of Facebook and Twitter postings referencing the aforementioned Postings) concerning any of the Plaintiffs shall be collectively referenced as the "Postings" unless otherwise specifically designated.

45.     The Postings expressly and/or implicitly concern the Nygard Entities and Plaintiff Nygard in his professional capacity as principal of the Nygard Entities, referencing purported Nygard employment practices and employees and utilizing marks identical with, or substantially indistinguishable from, the Nygard Trademarks.

46.     At the time Defendants published the Postings, Defendants knew of the falsity of the statements, representations, implications, innuendo, and/or other content contained in the Postings, were aware of their probable falsity, and/or recklessly disregarded the truth or falsity of the statements, based on information possessed, known by and/or reasonably available to Defendants contravening, qualifying and/or otherwise inconsistent with the statements, including

without limitation, publicly available records, Jasper's communications with counsel for Plaintiff wherein counsel expressly advised Jasper of the false and defamatory nature of the statements prior to the publication of the Postings, and, upon information and belief, the inconsistent, uncorroborated, unverified and/or otherwise dubious nature of the information and/or source(s) relied upon by Defendants in whole or in part.

47.     Upon information and belief, the Postings were accessed, viewed and read by readers in the State of Florida.

48.     Upon information and belief, Defendants' intention in using the Website to publish and disseminate the Postings was and continues to be for the purpose of harassing Plaintiff Nygard and damaging his companies, the Nygard Entities.

49.     Insofar as the Postings explicitly refer to Plaintiff Nygard in his capacity as CEO of the Nygard Entities, the nature of the retail business engaged in by the Nygard Entities, and feature the Nygard Trademarks, it is believed that Defendants' intention in using the Website and other outlets to publish and disseminate the Postings was and continues to be for the purpose of impugning the value of the Nygard Entities and the trademarks associated therewith, in order to prevent others from dealing with Plaintiff Nygard and/or the entities conducting business under his surname, within this Judicial District and elsewhere.

50.     Upon information and belief, Defendants, or someone at Defendant's direction, has altered certain elements, features, functionality, and content of the Website in an attempt to frustrate the actions taken by Plaintiffs.

51.     One alteration to the Website concerned the removal of contact information for "Press Inquiries" concerning Defendant Jasper, and for the provision of any notices to the

Website operator of Hollywoodstreetking.com as per paragraph 9 of the Website's Terms of Use. This alteration was in violation of the Website's Terms of Use (Paragraph 13) which provides that "Whenever Hollywood Street King changes its Terms of Use, we will post those changes to this Terms of Use page, and other places…"  Although changes were made to the Terms of Use, the Website continues to claim that the Terms of Use is effective January 11, 2009.  This statement is a misrepresentation insofar as changes were made without any notification to the users and change of the effective date on the Website.

52.     Another alteration to the Website concerned advertising on the Website and included the removal of an interactive feature whereby Defendant Jasper could be contacted "For display and brand ad sales and for press kit & rate card" inquiries at the following email: sales@diaryofahollywoodstreetking.com.

53.     Alterations have also been made to the Postings at issue, including the removal of the "By Jacky Jasper" designation from the 2.11.14 Posting.

54.     Upon information and belief, Defendants regularly transact business on the Website and derive substantial revenue from goods provided or services rendered in connection with the Website.

55.     Upon information and belief, the number of visitors to the Website has increased since Defendants' first publication of material concerning Plaintiffs, resulting in increased financial benefit accruing to Defendants as a result of the services furnished through the Website in Florida and elsewhere.

56.     Upon information and belief, the Website also permits or has permitted users to consummate commercial transactions directly on the Website, in connection with the purchase of

consumer goods including clothing merchandise. Because several changes have been made to the Website, it is unclear whether Defendants continue to process commercial transactions in this manner today.

57.     Defendants personally interact with users through the Website, by providing the content thereon, maintaining a mailing list to inform users about special events, and by responding directly to user-provided comments lodged on the several message board forums appearing below the content provided by the Defendants.

58.     The Website also contains several avenues which permit individuals to contact Defendants for the purpose of exchanging information, including by electronic means, telephone, and otherwise. One of the main headings currently appearing on the Website is entitled "Tell HSK" which solicits "tips" from users and provides a mechanism for contacting Defendants for free by phone via Google or by email.

59.     Another aspect of the services provided on the interactive Website includes or included the provision of "free legal advice" to Website users, stating: "Until further notice Hollywood Street King is offering the readers free legal advice and discounted services from one of Hollywood's most celebrated attorneys, Ronald Richards." Immediately below, users were invited to enter their name, email, and legal inquiry in text boxes provided under the heading "Hollywood Street King's 'Ask Ron.'" Because several changes have been made to the Website, it is unclear whether Defendants continue to solicit users in this manner today.

60.     The Defendants also actively solicits users to become members of the "HSK Street Team" stating "Jacky [Jasper] Wants YOU To Join…" and promising those who provide

their contact details to the Website with "free stuff" including promotional materials, tee shirts, stickers, and postcards.

61.     Upon information and belief, the services supplied by Defendants in connection with the operation of the Website are purposefully directed to Florida

62.     The services advertised and content provided on the Website include a "Call to Action" section wherein Defendants solicit users to become actively involved in certain causes, often through the contribution of money.

63.     All conditions precedent have occurred or been performed, including providing Defendant Jasper with notice in writing regarding the false and defamatory statements contained in the Postings.

## COUNT I:  DEFAMATION / LIBEL PER SE

64.     Plaintiff repeats and realleges each and every allegation set forth in Paragraphs 1 through 63 above as if fully set forth herein.

65.     Defendants, singularly and in concert, made false statements of fact of and concerning Plaintiff Nygard and the Nygard Entities without privilege or authorization and published these statements to third parties on the Internet, including without limitation on the Website and Affiliate Sites, with the intention that they reach a broad public audience, including without limitation, in connection with the Postings.

66.     The statements, representations, and other defamatory content created, authored, developed, communicated, published, hosted and disseminated by Defendants, singularly and in concert, including the assertions, implications and innuendo contained in the Postings referenced herein falsely, unambiguously and repeatedly assert that Plaintiff Nygard is a criminal, immoral,

and dishonest person engaged or complicit in criminal, sexually repugnant, unlawful, and nefarious activities (the "False Statements").

67.    The False Statements, including without limitation the assertion that Plaintiff Nygard has engaged in "unthinkable proven criminal actions" and specifically enumerated criminal and unlawful conduct and sexually-repugnant acts, were intended to and did disparage Plaintiff Nygard; injure Plaintiff Nygard in his business, reputation or occupation and damage confidence in his integrity, character and professional competence; and expose Plaintiff Nygard to hatred, ridicule, aversion, contempt, distrust, and disgrace.

68.    The False Statements, including without limitation the assertion that Plaintiff Nygard has engaged in "unthinkable proven criminal actions" and specifically enumerated criminal and unlawful conduct and sexually-repugnant acts, were intended to and did disparage the Nygard Entities; damage the reputation, integrity, and consumer confidence in the Nygard Entities; and expose the Nygard Entities to public hatred, ridicule, aversion, contempt, distrust, and disgrace.

69.    At the time Defendants published the False Statements, Defendants acted intentionally and with malice, having knowledge of the falsity of the statements and/or recklessly disregarding the truth or falsity of the statements, based on information known or reasonably available to Defendants explicitly contrary to and/or inconsistent with the statements, including without limitation, publicly available records, Jasper's communications with counsel for Plaintiff wherein counsel expressly advised Jasper of the false and defamatory nature of the False Statements prior to the publication of the Postings, and, upon information and belief, the

inconsistent and/or dubious nature in the information and/or source(s) relied upon by Defendants in whole or in part.

70.     Alternatively, Defendants had a duty to investigate and should have known that the False Statements were untrue before publishing the False Statements.

71.     Defendants knew that if the False Statements were published to the Internet, including via the Website and otherwise, this defamatory content would be published throughout the United States and globally. Defendants intended that their False Statements be published to the "millions" of HSK readers and the public at large, including readers in Florida. Defendant's conduct in publishing and disseminating the False Statements to third parties over the Internet in this manner was intentional, knowing, malicious, and with callous disregard of Plaintiffs' rights.

72.     Defendants' conduct in creating, developing, communicating, publishing and disseminating the False Statements to such a vast audience was deliberately calculated to injure the Nygard Entities and Plaintiff Nygard in his personal and professional capacity as principal of the Nygard Entities and prevent or discourage persons from associating and/or dealing with Plaintiff Nygard and the Nygard Entities, and to financially profit from such damage.

73.     As a direct and proximate result of Defendants' intentional publication and dissemination of the False Statements, Plaintiff Nygard has suffered, is suffering, and will continue to suffer permanent and irreparable injury, harm and damage to Plaintiff's personal and professional reputation The business interests of Plaintiff Nygard, i.e. the Nygard Entities doing business under his surname, are being similarly damaged by the False Statements.

74.     Defendants' unlawful conduct, including False Statements charging Plaintiff Nygard with the commission of crimes, subjecting Plaintiff to hatred, disgust, ridicule, aversion,

contempt and disgrace, and injuring Plaintiff Nygard in his trade or profession, constitutes defamation and libel *per se*.

75.     Plaintiffs have incurred substantial costs and expenses in addressing and counteracting Defendants' wrongful conduct.

76.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered, are suffering, and will continue to suffer severe and irreparable harm and substantial damages in an amount to be proven at trial, unless Defendants are permanently enjoined from engaging in such conduct.

77.     These damages include, without limitation, lost earnings, income and business opportunities, litigation costs and expenses including attorney fees, and other actual damages.

78.     As a result of Defendants' unlawful conduct, Defendants are answerable to Plaintiffs, jointly and severally, in actual, compensatory, exemplary and punitive damages.

## COUNT II:  TRADEMARK DILUTION
## IN VIOLATION OF 15 U.S.C. § 1125 BY THE NYGARD ENTITIES

79.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 78 above as if fully set forth herein.

80.     Defendants' conduct in using the famous and inherently distinctive Nygard Trademarks without authorization in connection with the Website is causing and, unless stopped, will continue to cause harm to the Nygard Trademarks by creating negative associations among the public and impugning the prestige and value of the Nygard Trademarks and high-quality goods they represent.

81.     Damage to the Trademarks will cause damage to the Plaintiffs unless immediately enjoined and remediated, all of which damage was caused by the conduct of the Defendants.

82.     Defendants' conduct constitutes trademark dilution in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(c).

## COUNT III:  TRADEMARK DILUTION
## IN VIOLATION OF §495.151 BY THE NYGARD ENTITIES

83.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 82 above as if fully set forth herein.

84.      Defendants' conduct in using the famous and inherently distinctive Nygard Trademarks without authorization in connection with the Website is causing and, unless stopped, will continue to cause harm to the Nygard Trademarks by creating negative associations among the public and impugning the prestige of the Nygard Trademarks and high-quality goods they represent.

85.     Damage to the Trademarks will cause damage to the Plaintiffs unless immediately enjoined and remediated, all of which damage was caused by the conduct of the Defendants.

86.     Defendant's conduct is improperly diluting the value of the Nygard Trademarks in violation of Florida Statute § 495.151.

## COUNT IV:  INVASION OF PRIVACY
## BY PLAINTIFF PETER NYGARD

87.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 86 above as if fully set forth herein.

88.     Defendants, without Plaintiff's authorization or consent, knowingly used Plaintiff's name, image, and voice in the Postings published and disseminated via the Internet in the State of Florida.

89.     Defendant's unauthorized use of Plaintiff's name, image, and voice was for the purposes of advertising or trade.

90.     Upon information and belief, Defendant obtained a commercial benefit from its publication of the Posting to the Internet by way of increased traffic to the Website, thereby violating Plaintiff's right of publicity.

91.     As discussed herein, the Videos were illegally obtained and do not relate to a matter of public interest.   Furthermore, the Postings are replete with inaccuracies and are materially and substantially false.

92.     Defendant acted intentionally, with malice or with reckless disregard, as to the truth or falsity of the Postings and with callous disregard of Plaintiff's rights.

93.     Defendant's violation of Plaintiff's right of publicity and privacy will cause damage to the Entity Plaintiffs by diminishing the value of the brand.

94.     Defendant's conduct constitutes a violation of law.

95.     As a result of Defendant's unlawful conduct, Plaintiff has suffered, is suffering, and, unless stopped, will continue to suffer severe and irreparable harm and substantial damages entitling Plaintiff to equitable and monetary damages in an amount to be determined at trial.

96.     As a result of Defendant's knowing conduct, Defendant is answerable in exemplary damages.

### COUNT V:  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS TO PLAINTIFF PETER NYGARD

97.     Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 96 above as if fully set forth herein.

98.     Defendants' publication and dissemination of the Postings on the Internet containing the False Statements and specifically identifying Plaintiff Nygard, Plaintiff's business, and containing other personally identifying information including at one point in time, his direct personal e-mail address and telephone number was done intentionally, willfully, maliciously, wantonly, and/or with such a reckless disregard and egregious indifference to Plaintiff Nygard that malice is imputed.

99.     Defendants' conduct was deliberately calculated and intended to and did cause severe emotional distress and damage to Plaintiff Nygard.

100.    Defendants' publication and dissemination of the Postings on the Internet in conjunction with the False Statements impugning Plaintiff's integrity, business, profession, and personal reputation by imputing Plaintiff with criminal conduct and specifically enumerated sexually repugnant acts  was extreme and outrageous, exceeding all bounds of common decency observed in a civilized community such that Defendants should have known such acts would result in severe emotional distress to Plaintiff.

101.    Defendants' extreme and outrageous conduct, including the publication and dissemination of the Postings on the Internet, intended to and did cause Plaintiff humiliation, mental anguish, and severe emotional distress personally and professionally, including damage to Plaintiff's integrity, character and professional competence.

102.    As a result of Defendants' unlawful conduct, Plaintiff has suffered, is suffering, and, unless stopped, will continue to suffer severe and irreparable harm and substantial damages in an amount to be determined at trial, but at least $75,000.00.

103.    As a result of Defendants' willful, wanton, egregious and malicious conduct, Defendants are answerable to Plaintiff Nygard, jointly and severally, for compensatory damages, punitive damages, nominal damages, costs, and such further relief the Court deems just and proper.

## COUNT VII:  DEFAMATION / LIBEL BY IMPLICATION

104.    Plaintiffs repeat and reallege each and every allegation set forth in Paragraphs 1 through 103 above as if fully set forth herein.

105.    Defendant's publication and dissemination of the Postings contain images, statements and innuendo that, reasonably interpreted, assert and/or imply false and defamatory statements regarding Plaintiffs.  Such defamation by implication includes without limitation, the publication of the above-referenced statements which, as a result of the omission of facts and/or the juxtaposition with other material, provide the reader the false and/or misleading impression that Plaintiff Peter Nygard has been convicted of various crimes and/or otherwise engaged in criminal or sexually repugnant conduct.

106.    The statements asserting and/or falsely implying or suggesting that Plaintiff Peter Nygard has been convicted of various crimes and/or otherwise engaged in criminal or sexually repugnant conduct are false.

107.    The statements asserting and/or falsely implying or suggesting that Plaintiff Peter Nygard has been convicted of various crimes and/or otherwise engaged in criminal or sexually repugnant conduct were intended to and did disparage Plaintiff, expose him to hatred, ridicule, contempt and distrust, and injure him in his business, reputation or occupation.

108.     Upon information and belief, Defendant intended to endorse such false statements and innuendo in publishing the Postings to the Website and other outlets.

109.     Defendant's unlawful conduct constitutes defamation / libel by implication under the law of the State of Florida and other states.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

A.     Grant judgment in favor of Plaintiffs and against Defendants on all of Plaintiffs claims;

B.     Declare that Defendants' statements are defamatory to Plaintiffs and award actual and punitive damages in an amount to be determined at trial;

C.     Permanently enjoin and restrain Defendants, their agents, subsidiaries, servants, partners, employees, and all others in active concert or participation with Defendants, from using the Nygard Trademarks in any manner;

D.     Permanently enjoin and restrain Defendants, their agents, subsidiaries, servants, partners, employees, and all others in active concert or participation with Defendants from making and disseminating defamatory statements regarding Plaintiffs and assisting, aiding, or abetting any other person or entity in engaging or performing any of the aforementioned activities;

E.     Permanently enjoin Defendants, their agents, subsidiaries, servants, partners, employees, and all others in active concert or participation with Defendants, from engaging in any conduct or act which would reasonably be foreseen to harass any of the Plaintiffs;

F.      Order that Defendants delete and permanently remove all of the Postings referenced herein and any such further postings by Defendants regarding any of the Plaintiffs;

G.      Order that Defendants delete and permanently remove all content displaying unauthorized reproductions of the Nygard Trademarks or defaming Plaintiffs from the Website and any other domain in Defendants' possession, custody, or control;

H.      Award Plaintiffs actual damages;

I.      Award Plaintiffs compensatory damages;

J.      Award Plaintiffs such punitive damages for Defendants' willful and intentional acts in an amount the Court deems just and proper;

K.      Award Plaintiffs pre-judgment interest on any judgment as provided by law;

L.      Award Plaintiffs reasonable attorney's fees, costs, disbursements, and interest as provided by law;

M.      Order that the amount of any damages, profits, or other monetary relief obtained or granted be increased or trebled as provided by law; and

/

/

/

/

/

/

/

N.      Grant such other and further relief as the Court may deem just and proper.

Dated:      August 19, 2015
            Orlando, Florida

                        Respectfully Submitted,

                        **WILSON ELSER MOSKOWITZ
                        EDELMAN & DICKER LLP**

                        By:   */s/ Sean M. McDonough*
                              Sean M. McDonough
                              Florida Bar No. 896446
                              Amy L. Baker
                              Florida Bar No. 86912
                              111 North Orange Avenue
                              Suite 1200
                              Orlando, FL 32801
                              Telephone:  407.203.7599
                              Facsimile: 407.648.1376
                              sean.mcdonough@wilsonelser.com
                              amy.baker@wilsonelser.com

                              *Attorneys for Plaintiffs*